## United States Court of Appeals
### For the Eighth Circuit
_____

No. 25-2472
_____

Jennifer Audette; Robert Audette

*Plaintiffs - Appellants*

v.

Lake of the Woods County; Lake of the Woods Board of Commissioners; James Nordlof, in his official capacity as a Board member; Cody Hasbargen, in his official capacity as a Board member; Joe Grund, in his official capacity as a Board member; Jon Waibel, in his official capacity as a Board member; Edward Arneson, in his official capacity as a Board member

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: February 10, 2026
Filed: July 24, 2026
_____

Before LOKEN, L.R. SMITH, and STRAS, Circuit Judges.
_____

L.R. SMITH, Circuit Judge.

Robert and Jennifer Audette (collectively, "the Audettes") own a home on the Lake of the Woods in Minnesota. Without prior approval from Lake of the Woods County (the County), the Audettes poured a 12-foot-wide concrete ramp from their

property to the lake's ordinary high-water mark. They attempted to get post-construction approval but the County denied it. Following the denial of their conditional use permit, the Audettes sued the County and its officials, alleging discrimination under Title II of the Americans with Disabilities Act (ADA). The district court[1] determined that the Audettes missed their opportunity to request an accommodation by violating the County's instructions. The Audettes appeal. For the following reasons, we affirm.

## I. *Background*

Minnesota state law recognizes that conservation efforts require compromise between development and preservation. The Minnesota legislature passed two acts, the Shoreland Management Act and the Wetland Conservation Act, to balance the interests between lakeshore development and water conservation. The Wetland Conservation Act emphasizes avoidance of development and prohibits interference with wetlands "unless replaced by actions that provide at least equal public value under a replacement plan . . . ." Minn. Stat. § 103G.222, subd. 1(a). The Shoreland Management Act, by comparison, creates minimum standards for construction, such as structure setbacks and impervious surface limits. *See* Minn. Stat. § 103F.211.

In 2019 the Audettes bought a lakefront home within the Lake of the Woods shoreland. In June 2020, Robert Audette (Robert) met with the County Land and Water Planning Director Josh Strumland and an environmental specialist to discuss plans for property improvements, including additions to the home's garage. During the site visit, the officials looked at a staked-out garage addition and informed Robert that because the project would be on existing wetland fill, he would not need a permit, "as long as he stays on the existing fill" and ensured that any new concrete stayed under "400 sq[uare] f[ee]t". R. Doc. 28-3, at 2.

---

[1]The Honorable Laura M. Provinzino, United States District Judge for the District of Minnesota.

At that site visit, the County officials also discussed Robert's interest in paving a new driveway and installing a new septic system. Director Strumland, unaware of Robert's plans to pave any other part of the property, told Robert that he could pour concrete to connect his deck to the corner of his garage. Strumland also told Robert that he should install the septic system in a filled area to avoid any wetland impact or necessitate an application to purchase wetland credits as required for new fill.

Without County approval, the Audettes constructed a large concrete ramp down to the Lake of the Woods ordinary high-water line. In June 2021, a site inspection confirmed numerous violations resulting from the ramp's construction. The next month, a Lake of the Woods Soil and Water Conservation District (SWCD) conservationist published a restoration order that identified approximately 2,122 square feet of wetland impact attributable to the new ramp—more than five times the 400 square feet of new fill discussed at the site visit. The County issued a restoration order directing the Audettes to restore the shoreline to pre-altered conditions. Later that year, the SWCD chair informed Robert that removing the state-funded shoreline riprap and pouring the concrete ramp violated a cost-share project. Robert knew the ramp dismantled a cost-share project when it was constructed.

In August 2021, Director Strumland also sent Robert correspondence regarding the violations. Strumland noted the permitting requirements, but he suggested that Robert apply for an after-the-fact permit.

In September 2021, Robert submitted an after-the-fact conditional-use permit application describing a "12 ft wide concrete boat ramp" and stating the ramp would provide safe lake access for his family and that "[t]his slab provides handicap accessibility to the lake for my wife. It was built with access and safety in mind." R. Doc. 28-11, at 7, 11. Robert did not request the required preapplication meeting.

In November 2021, the Lake of the Woods County Planning Commission (Planning Commission) held a hearing. Robert's representative informed the Planning Commission that Robert "poured the concrete . . . because of his wife's health issues." R. Doc. 34-2, at 2–3. Robert told the Planning Commission that although he knew the state had installed the riprap he believed he "c[ould] legally put in my own boat ramp." *Id.* at 5. He said he did not apply to pour more concrete because as he continued to pour, a windstorm damaged trees so he extended the walkway "to make it look nice." *Id.* at 6. One of the Planning Commission members noted:

> [W]e can pretty much do whatever, suggest whatever we want to the [C]ounty [B]oard who makes the final decision. I guess, to me he went over and above with the concrete that was not only the 12 foot boat ramp going down but also the extension of the concrete from the garage and the house forward on the property before the boat ramp even takes off from there. You know, if it's access for your wife and I understand that I think a normal size sidewalk . . . would've been acceptable to me. A 12 foot boat ramp with all the additional concrete is not acceptable.

*Id.* at 6–7. Another member noted that the water levels would not allow "any size of [a] boat other than a kayak" in the lake, and Robert affirmed that building a boat launch was "never my intention." *Id.* at 9. Ultimately, the Planning Commission recommended approval with conditions, including removing some concrete, allowing a "12 foot wide walkway" to the lake, and replacing riprap to the edges of the slab. *Id.* at 35.

On November 9, 2021, the County Board met to consider the permit application. Director Strumland opened the meeting by addressing the County Board.

> [Director Strumland]: In the application[,] Robert did make mention the reason for the 12-foot wide is wife currently has [multiple sclerosis] and with the kids and everybody there[,] [t]he reason why he removed the [riprap] was [medical], and there was a windstorm that came through and one thing led to another and the trees that were falling

down and all of a sudden I just kept going and one thing led to another and you have access to the lake now via the 12 foot wide concrete slab.

R. Doc. 28-16, at 2. One County Board member asked Director Strumland, "He could have [come] to you originally and asked for a ramp first. Correct?" *Id.* at 4. Strumland replied that he had gone "out" to the Audettes' property but the new ramp "was not what we discussed" at that time. *Id.* He told the County Board that the boat ramp was "[n]ever in [the] original discussion that we had." *Id.* Another County Board member asked Strumland "if it was just for . . . kayaking purposes, couldn't [Robert] have built a board lock or something?" *Id.* at 5. Director Strumland replied, "Right." *Id.* at 6.

The County Board noted that granting the permit after-the-fact would be a "can of worms scenario. You approve it and then there's just no credibility whatsoever." *Id.* at 8.

> [Director Strumland]: . . . [W]e're acknowledging that what he did is not correct, but still have some allowance for his wife to still get down to the lake. Now I'm not saying that currently that individual needs 12 feet. 12 feet is pretty wide. Now again, honestly within our ordinance, like a four-foot-wide boardwalk or a four-foot-wide sidewalk is typically allowed for residential structures. . . . Now is four foot not enough? Is eight foot too much? I don't know.
> 
> . . .
> 
> Depends on how severe this debilitating disease is that she has and how quickly it moves. And I mean there[']s a lot of ifs, ands and buts when it comes to that.
> 
> [Board Member]: But if he'd come to you right away with that situation, there would've been an avenue.
> [Director Strumland]: So yes, we would've given them options.

*Id.* at 9–10.

[Board Member 1]: Like I said, I don't think we can approve it.

. . .

[Board Member 2]: He's going to appeal it. He's got a lawyer.

. . .

[Board Member 3]: . . . [W]e can look at it and say, alright, you did this, and you should have done that. Going to cost you this. . . . [B]ut like I said, I don't think we could approve this. We should deny it . . . . [B]ut like I said, my biggest fear in this thing is the trickledown effect. . . .

[Director Strumland]: We deal with after the fact stuff all the time still.

[Board Member 3]: No, I know you do, but also people that maybe have tried to get things and they say no and then all of a sudden— You don't want to give people the free for all to just go do it.

[Director Strumland]: All it has happened on a case is where we said may do this or recommend this and, yep, pretty soon, it's not what you recommend.

[Board Member 3]: An amusement park.

. . .

[Board member 4]: . . . [I]n my mind . . . his intent was obvious. He knew he was going beyond what he was permitted to . . . . There [were] other things [he] could have done. He could have—if it was just for kayaks he could have built a boardwalk.

*Id.* at 19–21, 39.

Ultimately, the County Board voted to deny the Audettes' after-the-fact conditional use permit. It provided the following reasons in support of its denial:

-6-

[1] The nutrient impairment of Lake of the Woods.

[2] Shoreland stabilization projects to prevent further erosion of shoreline which reduces or eliminates sedimentation and excess nutrients entering Lake of the Woods.

[3] The applicant didn't follow process/protocol and is an egregious violation of the Lake of the Woods County Zoning Ordinance [(Ordinance)]. The applicant was aware of process/protocols in place as two previous permits were applied for and approved for the installation of septic system and addition onto the existing garage.

[4] Applicant sought project assistance from the Land and Water Planning Office as noted in the file from a site visit to the property in June 10, 2020 but, went ahead without the required approvals.

[5] Alternative solutions to gain access to the lake exist that would be more environmentally friendly while still allowing the rock rip rap to remain intact and still allowing access . . . ; however, applicant didn't seek project assistance from the Land and Water Planning Office [(Planning Office)] prior to undertaking the project.

R. Doc. 28-17, at 4. The County Board directed the Audettes to restore their property to "original conditions as existed prior to the project occurring" and additionally required the Audettes to "restore[]" the riprap "to the previous engineered standards" by no later than July 31, 2022. *Id.* at 5.

Neither Robert nor his attorney attended the County Board meeting, though they were both informed of its time and location following the Planning Commission hearing.

In July 2022, the Audettes submitted a Joint Application Form for Activities Affecting Water Resources in Minnesota seeking approval of a wetland replacement plan under the Wetland Conservation Act. Such applications are required for projects "that may affect a water resource," such as wetlands. R. Doc. 34-12, at 1. The Audettes sought to keep the concrete and argued that the "concrete is crucial and the

-7-

area surrounding needs to remain unharmed" "due to ADA compliant accommodation for family members with disabilities." *Id.* at 5. The Audettes presented compliance options, including purchasing wetland credits, paying a fine, repurposing wetland areas, or removing a portion of the concrete ramp.

In August 2022, the Planning Office denied the request after finding that the proposal did "little to reduce the overall wetland impacts to accomplish the project and no alternatives were identified." R. Doc. 28-22, at 3. The Planning Office observed that the boat ramp would remain in violation of County zoning ordinances even if it complied with the Wetland Conservation Act. The Audettes appealed this decision to the Minnesota Board of Water and Soil Resources. That board denied the appeal "as without sufficient merit, pursuant to Minn. Stat. § 103G.2242, Subd. 9 and Minn. Rules Chapter 8420.0905, Subp. 4." R. Doc. 28-33, at 6.

In September 2023, the Minnesota Department of Natural Resources issued citations to the Audettes for failure to comply with a Wetland Conservation Act restoration order, as the Audettes had failed to commence any restoration work and thus remained in noncompliance.

The Audettes filed this suit against the County and its officials in March 2024. They alleged that the "Board failed to reasonably accommodate Jennifer Audette's disability under the ADA by denying the Audettes' conditional use permit application." R. Doc. 47, at 8. The district court granted summary judgment to the County in June of 2025. We now affirm.

## II. *Discussion*

The Audettes argue the district court "erred when it determined the County had no obligation to accommodate Jennifer's disability." Appellant's Br. 16. In their view, the district court's action requires "[d]isabled landowners" to "forfeit their right to accommodations under the [ADA] when they mistakenly construct an accommodating use without all proper permitting on their real property, and when the government provides for an after-the-fact permitting procedure, and when the

-8-

landowner follows that procedure." *Id.* They also argue that the district court erred "when it determined that no reasonable trier of fact could conclude that [County] Board member's statements and actions provided the discriminatory motive to deny the Audettes' accommodation request under either the direct or indirect evidence test." *Id.* at 19–20. Specifically, they contend that "[t]he County deviated from its standard policies and procedures when it broke from the Planning Commission's recommendation, thus giving rise to an inference of discrimination." *Id.* at 19.

## A. *Standard of Review*

We review a "district court's summary-judgment ruling de novo." *Huber v. Westar Foods, Inc.*, 139 F.4th 615, 620 (8th Cir. 2025). We affirm the district court

> when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. A genuine issue for trial exists when a reasonable jury could return a verdict for the nonmoving party.

*Id.* (citation modified).

## B. *ADA Claim*

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The term "public entity" includes the County and its Board. *See id.* § 12131(1)(A)–(B) (defining "public entity" as "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government"). Implementing regulations promulgated by the Department of Justice require that

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7)(i). A plaintiff may allege discrimination under Title II on three different theories: disparate treatment, disparate impact, or failure to accommodate. *See One Love Hous., LLC v. City of Anoka, Minn.*, 93 F.4th 424, 435 (8th Cir. 2024). The Audettes raise both a failure-to-accommodate theory and a disparate treatment claim. We will address both.

### 1. *Failure to Accommodate*

"For a prima facie Title II ADA violation, a qualified individual with a disability must be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or be otherwise discriminated against by the entity, by reason of the individual's disability." *Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 983 (8th Cir. 2013).[2] By extension, "[f]ailing to make a reasonable accommodation constitutes discrimination." *Mobley v. St. Lukes Health Sys., Inc.*, 53 F.4th 452, 456 (8th Cir. 2022).

We note at the outset that "Title II does not require a plaintiff to receive her preferred accommodation, but merely a reasonable one that provides meaningful access to the public entity." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 326 (6th Cir. 2023) (citation modified). That is, a "reasonable accommodation[]." *Folkerts*, 707 F.3d at 983. Accommodation duties only arise when the public entity learns of the need for the accommodation. *See, e.g.*, *Randolph v. Rodgers*, 170 F.3d 850, 858–59 (8th Cir. 1999).

"To prevail under [Title II of] the ADA, [the Audettes] must show that the accommodations offered by the County were not reasonable, and that [they] [were]

---

[2]We note that "[t]he ADA and § 504 of the Rehabilitation Act [42 U.S.C. § 12132, et seq.] are similar in substance and, with the exception of the Rehabilitation Act's federal funding requirement, cases interpreting either are applicable and interchangeable for analytical purposes." *Id.* (citation modified).

unable to participate equally in the proceedings at issue." *Duval v. Cnty. of Kitsap*, 260 F.3d 1124, 1137 (9th Cir. 2001); *see DeBoard v. Bd. of Ed. of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir. 1997) ("Title II does not define discrimination as including the failure to make reasonable modifications, but [the DOJ] regulation states a public entity must make reasonable modifications in policies when necessary to avoid discrimination."). The County's Ordinance proposes an accommodation for people with mobility disabilities that enables the construction of a walkway to the lake. However, the Audettes never sought the County's permission to construct this offered accommodation. Instead, they constructed a 12-foot-wide boat ramp without first engaging the County. Moreover, they constructed the ramp with prior knowledge about the permitting regime and the limits to their requested projects. On this record, the Audettes cannot show either that the County offered unreasonable accommodations or that they could not equally participate in the proceedings.

An ADA accommodation request must be reasonable. The Audettes argue that because the County's Ordinance "provides a process for landowners to submit after-the-fact conditional use permits applications," their request was reasonable. Appellant's Br. 21. They contend that because the County offers an after-the-fact process, and because they notified the County of the disability during that process, the required reasonable accommodation responsibility began in the after-the-fact process. We disagree. The Audettes' request in the after-the-fact application was not a simple request that the County extend a reasonable accommodation to their construction process. They instead asked the County to defer and rescind the citation's disciplinary consequences.

The County's Ordinance mentions an after-the-fact conditional use permit only in § 1110, titled "Enforcement and Penalties." J.A. 1106. Section 1110 of the Ordinance provides, in relevant part:

> In the event of violation or threatening violation of this ordinance, the County Board of Commissioners in addition to other

-11-

remedies including prosecution, may institute appropriate actions or proceedings to prevent, restrain, correct or abate such violations or threatened violations, and it shall be the duty of the Lake of the Woods County Attorney to institute such action.

. . .

Any person, firm or corporation who shall violate any of the provisions herein, or who shall fail to comply with any of the provisions herein, or who shall make any false statement in any document required to be submitted under such provisions, shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by such penalties and fines provided by law. Each day that the violation continues shall constitute a separate offense.

Any application for a permit which is made after the work is commenced and which requires a permit shall be charged an after-the-fact administrative fee, as established by resolution of the Lake of the Woods County Board of Commissioners. The Planning Commission and/or Board of Adjustment may require administrative penalties, correction and/or restoration of the property to its original state before the permit is considered.

*Id.* at 1106–07.[3] Section 1105 outlines the procedures for applying for a conditional use permit, but it is silent as to an after-the-fact permit. While the County's Ordinance contemplates seeking a conditional use permit after-the-fact, it requires the applicant to pay a fee. But the Ordinance is silent as to whether the after-the-fact permit exists as of right for projects already in violation. Here, the Audettes only sought the after-the-fact conditional use permit after they were already in violation of the Ordinance and the instructions given during the initial site visit. The County first learned of Jennifer Audette's disability during its enforcement proceedings.

The Audettes are correct that "[a] disabled landowner does not forfeit their right to ADA accommodations the moment the landowner violates a zoning

---

[3]The ordinance is available online on the Lake of the Woods County website. Lake of the Woods County Ordinances, https://lotwcounty.gov/land-water/ordinances/ (last visited Jun. 26, 2026).

ordinance," Appellant's Br. 22, but that is not what happened here. The Audettes had prior knowledge of the Ordinance and received instructions regarding how much fill they were permitted. They did not raise the disability at that time and instead proceeded with an unlawful construction process. Then, after they were in violation of the County's Ordinance, they raised the disability. We note here that property owners in Minnesota are "charged with knowledge of whether a local zoning ordinance permits construction undertaken on the property." *Stotts v. Wright Cnty.*, 478 N.W.2d 802, 805 (Minn. App. 1991) (citing *Jasaka Co. v. City of St. Paul*, 309 N.W.2d 40, 44 (Minn. 1981) ("It was the duty of [the property owner] to determine for itself the propriety of the proposed construction it undertook, and had it done so the most cursory inquiry would have disclosed the problems it now seeks to correct.")). Moreover, the Audettes did not only fail to seek a reasonable accommodation at the appropriate time, they also failed to properly pursue the after-the-fact permit. On this record, the County has not been shown to be in violation of the ADA's accommodation duties.

## 2. *Discriminatory Treatment*

The County also has not been shown to have discriminated against Jennifer. In the employment context, we "ha[ve] long recognized that a party may prove intentional discrimination under the ADA either by direct or indirect evidence." *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018) (citation modified); *accord Bennett*, 86 F.4th at 325 ("To show causation as part of an intentional discrimination claim under Title II—that discrimination was 'because of' a disability—a plaintiff can use either direct or indirect evidence of discrimination."). Absent direct evidence, the plaintiff bears the initial burden of showing the reasonableness of the requested accommodation under the *McDonnell Douglas*[4] burden shifting framework. *Bennett*, 86 F.4th at 325; *cf. Schaffhauser*, 794 F.3d at 906 (holding the same in the ADA employment context). "Direct evidence is that which shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that

---

[4]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

an illegitimate criterion actually motivated the adverse employment action." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012) (citation modified). This "includes evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude, where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Lipp*, 911 F.3d at 543 (citation modified). Absent direct evidence, we look for indirect evidence. *Id.* at 544.

The Audettes argue that the Board meeting provided direct evidence of intentional discrimination. Intentional discrimination requires "more than intent as volition or intent as awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). "It implies that the decisionmaker, in this case a state [board], selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (citation modified). We find that the Audettes' evidence provides no evidence of intentional discrimination.

The Audettes point to three examples of alleged intentional discrimination, where, they argue, the Board likened Jennifer's disability to "insider trading, underage drinking, and the construction of an amusement park." Appellants' Br. 51 (citation modified). These examples, even viewed most favorably to the Audettes, fail to show animus by the board towards Jennifer's disability status. Rather, the comments concern the unreasonable delay in seeking a use permit for the construction of the ramp and not seeking disability accommodation until penalties were imposed. They do not provide any evidence that the Board based its decision, even in part, on any animus towards Jennifer's disability. We likewise find no indirect evidence of discrimination.

## III. *Conclusion*

For these reasons, we affirm.

_____